IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Carolyn Jefferson, | ) | C/A No.: 1:15-786-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On February 2, 2010, Plaintiff filed an application for DIB in which she alleged her disability began on May 20, 2009. Tr. at 94, 245–51. Her application was denied initially and upon reconsideration. Tr. at 132–35, 137–38. On August 26, 2011, Plaintiff

had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 51–76 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 21, 2011. Tr. at 97–118. The Appeals Council subsequently issued an ordering vacating the ALJ's decision and remanding the case to the ALJ. Tr. at 119–22. Plaintiff had a second hearing before the ALJ on November 21, 2013. Tr. at 34–49 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 16, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 24, 2015. [ECF No. 1].

      B.    Plaintiff's Background and Medical History

          1.    Background

Plaintiff was 51 years old at the time of the most recent hearing. Tr. at 37. She completed two years of college and obtained an associate's degree in business. *Id.* Her past relevant work ("PRW") was as a retail sales clerk and a collections agent. Tr. at 47–48. She alleges she has been unable to work since May 20, 2009. Tr. at 94.

          2.    Medical History

Plaintiff was admitted to Bon Secours St. Francis Hospital on May 21, 2009, with acute pelvic pain as a result of a complex multi-cystic ovarian mass. Tr. at 421–22. She underwent removal of her bilateral ovaries. *Id.*

Plaintiff followed up with her gynecologist Francis Akom, M.D. ("Dr. Akom"), on June 29, 2009. Tr. at 437. Dr. Akom indicated Plaintiff had severe vasomotor symptoms and affective disorder. *Id.* He prescribed Premarin and Lexapro and instructed Plaintiff to follow up in a month. *Id.* Plaintiff contacted Dr. Akom's office on July 21, 2009, to report worsened mood swings, crying, inability to function, and loss of interest in activities. *Id.* Dr. Akom referred Plaintiff to a psychiatrist and instructed her to visit the emergency room if her symptoms worsened. *Id.*

On July 24, 2009, Plaintiff presented to Wendy Molinaroli, MED, LPC, NCC ("Ms. Molinaroli"), for individual psychotherapy. Tr. at 471. She reported she did not want to leave her bed or to bathe. *Id.* She indicated she was feeling sad and was crying and screaming at her children. *Id.* She complained of having no energy and being tired all the time. *Id.* Ms. Molinaroli diagnosed severe major depressive disorder without psychotic features. *Id.* She observed that Plaintiff was well-oriented; had an open and cooperative attitude; was partially aware of her problems; was reflective and able to resist urges; and demonstrated fair judgment. Tr. at 472. She described Plaintiff as hypervigilant with a restricted affect and depressed mood. Id. She noted that Plaintiff appeared disheveled, had poor ability to maintain eye contact, and spoke rapidly. Id. She noted Plaintiff's recent memory was moderately impaired, that her reaction times were slowed, and that she unable to attend and maintain focus. Id. Ms. Molinaroli indicated Plaintiff had mild suicidal ideation, but guaranteed her safety and agreed to see the psychiatrist. *Id.* She recommended Plaintiff participate in 16 weekly individual therapy session. Tr. at 473.

Plaintiff presented to psychiatrist Eduardo Cifuentes, M.D. ("Dr. Cifuentes"), on July 28, 2009. Tr. at 584. Dr. Cifuentes described Plaintiff as groomed and able to maintain eye contact; calm and cooperative; having normal activity; demonstrating depressed mood; and having appropriate affect. Tr. at 586. He indicated Plaintiff's symptoms included increased sleep, anhedonia, irritability, mood swings, panic attacks, anxiety, forgetfulness, and decreased energy, motivation, and concentration. *Id.* He assessed Plaintiff as having a clear and goal-directed thought process, normal thought content, no suicidal ideation, normal orientation, normal language, and average intelligence. *Id.* He diagnosed depression, not otherwise specified ("NOS") and anxiety, NOS; assessed a Global Assessment of Functioning ("GAF")[1] score of 55; discontinued Lexapro; and prescribed Cymbalta. Tr. at 587.

On August 11, 2009 Plaintiff informed Dr. Cifuentes that she felt nervous all the time and that her medication did not seem to be working. Tr. at 508. She was anxious and complained of decreased energy. *Id.* Dr. Cifuentes observed Plaintiff to have an irritable mood; a restricted affect; moderately impaired recent memory; and distracted attention and concentration. *Id.* He observed Plaintiff to demonstrate a slowed gait. *Id.* Dr. Cifuentes assessed Plaintiff's response to intervention to be poor, discontinued Cymbalta, prescribed Celexa, and assessed a GAF score of 56. *Id.*

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

On August 14, 2009, Ms. Molinaroli indicated in a letter to Plaintiff's private disability insurer that she was suffering from severe major depressive disorder without psychotic features that resulted in her sleeping all time, neglecting her hygiene, isolating from family and friends, and yelling at her children. Tr. at 443. Ms. Molinaroli stated Plaintiff had significant physical side effects from her surgery, including hair loss, hot flashes, hoarseness, and skin problems. *Id.* She noted Plaintiff met all the criteria for depression, including sleep disturbance, lack of interest, guilt/self-blame, loss of energy, loss of concentration, memory disturbance, loss of appetite, psychomotor retardation, neglect of hygiene and health needs, and passive suicidal thought. *Id.* She recommended Plaintiff remain out of work to participate in treatment, but indicated Plaintiff would be able to return to work once her depressive features lifted. *Id.*

On August 25, 2009, Ms. Molinaroli indicated Plaintiff had her nails done as directed and attended a parents' night at her child's school. Tr. at 465. She observed that Plaintiff was wearing the same clothes she wore to her last visit and had poor eye contact. *Id.* Plaintiff reported staying in bed all day and bathing only twice a week. *Id.* She indicated she was tired, but was unable to sleep. *Id.* Ms. Molinaroli indicated Plaintiff was motivated, participated well during sessions, and was highly compliant with treatment recommendations. *Id.*

Plaintiff visited Dr. Cifuentes on August 25, 2009, and complained of dry mouth and constipation. Tr. at 506. She indicated she was tired, but had trouble sleeping. *Id.* Plaintiff endorsed decreased sleep, appetite, and energy. *Id.* Dr. Cifuentes noted that Plaintiff had mood swings and restricted affect. *Id.* He assessed a GAF score of 58.

On August 26, 2009, Plaintiff presented to Betty Antia-Obong, M.D. ("Dr. Antia-Obong"), to request that her medications for diabetes and hypertension be refilled. Tr. at 481. Dr. Antia-Obong indicated Plaintiff appeared anxious. *Id.*

On September 1, 2009, Ms. Molinaroli indicated Plaintiff had recently lost seven pounds because she had no appetite. Tr. at 734. Plaintiff stated she often overreacted and misplaced items. *Id.* She endorsed sleep disturbance and indicated she was not showering regularly. *Id.* Ms. Molinaroli described Plaintiff as having excellent motivation and participating actively in the session, but noted that she had difficulty focusing on one topic. *Id.*

On September 8, 2009, Plaintiff reported to Ms. Molinaroli that she was very forgetful. Tr. at 463. She indicated she walked her dog more often, but continued to avoid people. *Id.* She stated her antidepressant was causing her to feel very tired and to oversleep. *Id.* Ms. Molinaroli noted Plaintiff had difficulty seeing alternative perspectives and was focused on her physical symptoms. *Id.*

Plaintiff indicated she was doing better on September 10, 2009, but stated she felt hyper and still did not want to be around people. Tr. at 505. She complained that Celexa caused dry mouth and drowsiness. *Id.* Dr. Cifuentes noted that Plaintiff's recent memory was moderately impaired and that she was distracted and inattentive. *Id.* He assessed a GAF score of 60. *Id.*

On September 15, 2009, Plaintiff indicated that she recently forgot to report for jury duty. Tr. at 732. She stated she continued to isolate because she feared that others

would talk about her. *Id.* Ms. Molinaroli noted that Plaintiff had difficulty seeing alternative perspectives. *Id.*

Plaintiff indicated to Dr. Antia-Obong that she was anxious, stressed, and depressed on September 24, 2009. Tr. at 479. Dr. Antia-Obong noted that Plaintiff "went into a manic panic" while discussing her insulin. Tr. at 479–80. She suspected a "bipolar tendency" and noted that Plaintiff's mental health issues were "impacting management of her physical health." Tr. at 480.

On October 5, 2009, Ms. Molinaroli observed that Plaintiff's depression appeared to be lifting. Tr. at 467. She stated Plaintiff was dressed nicely. *Id.* Plaintiff indicated she was taking walks, showering regularly, and was planning to attend her son's football game. *Id.* Ms. Molinaroli stated Plaintiff was making definite progress. *Id.*

Plaintiff reported some improvement to Dr. Cifuentes on October 13, 2009. Tr. at 504. Dr. Cifuentes indicated Plaintiff had good response to interventions, but noted that the dry mouth caused by Celexa was not good for Plaintiff's gums. *Id.* He discontinued Celexa and prescribed Lexapro and Klonopin. *Id.* He assessed a GAF score of 65. *Id.*

On October 19, 2009, Ms. Molinaroli indicated Plaintiff's change in medication had caused a regression in her progress. Tr. at 469. Plaintiff indicated she had stopped bathing regularly and had not gone to her son's football game because she had no energy and did not want to talk to anyone. *Id.* Ms. Molinaroli encouraged Plaintiff to contact Dr. Cifuentes to report the noticeable difference in her mood and behavior. *Id.* Plaintiff followed up with Ms. Molinaroli on October 26, 2009, and showed no improvement. Tr.

at 727. Plaintiff denied having contacted Dr. Cifuentes to request her medication be changed and stated she "did not want to be a pest." *Id.*

On October 27, 2009, Plaintiff presented to Dr. Cifuentes with concerns about going back to work. Tr. at 503. Dr. Cifuentes described Plaintiff as anxious and panicked. *Id.* He discontinued Lexapro, prescribed Effexor XR, instructed Plaintiff to follow up in two weeks, and assessed a GAF score of 60. *Id.*

On November 9, 2009, Ms. Molinaroli observed that Plaintiff's nails had been snapped off. Tr. at 461. Plaintiff indicated her hairdresser had offered to wash and set her hair for free, but she had refused to leave her house. *Id.* She endorsed a new fear of being attacked, but stated she felt safe in her home. *Id.* Ms. Molinaroli indicated Plaintiff was active and verbal during the session and was able to express her feelings. Tr. at 462.

On November 10, 2009, Plaintiff informed Dr. Cifuentes that she was unable to afford Effexor XR. Tr. at 501. She indicated her sleep, interest level, motivation, and energy were all decreased. *Id.* Dr. Cifuentes prescribed Zoloft and assessed a GAF score of 58. *Id.*

On November 16, 2009, Plaintiff expressed frustration over her difficulties in obtaining disability benefits and fear over recent robberies and gang-related violence near her home. Tr. at 720. Ms. Molinaroli noted that Plaintiff focused on the relevant topic and participated actively in the treatment session. *Id.* She recommended Plaintiff engage in activities that may help her feel better. *Id.*

On November 23, 2009, Plaintiff reported decreased interest level, motivation, and energy since starting Zoloft. Tr. at 500. Dr. Cifuentes noted Plaintiff had a depressed

mood, a blunted affect, and was anxious. *Id.* He discontinued Zoloft, prescribed Prozac, and assessed a GAF score of 58. Tr. at 500.

On December 7, 2009, Plaintiff reported to Dr. Cifuentes that she felt unmotivated and was anxious when she went out in public. Tr. at 499. She endorsed decreases in appetite, interest level, motivation, energy, and self-care. *Id.* Dr. Cifuentes noted that Plaintiff had no motivation or desire to do anything. *Id.* He indicated Plaintiff's response to interventions was poor and assessed a GAF score of 55. *Id.*

Plaintiff endorsed increased anxiety on December 14, 2009. Tr. at 714. Ms. Molinaroli noted Plaintiff had been picking at her nails. *Id.* Plaintiff reported she had nearly been involved in a car accident on the way to the visit because of her inattention. *Id.* She indicated she was only bathing once a week and was not going out. *Id.*

On December 28, 2009, Dr. Antia-Obong noted that Plaintiff's medications were adequately controlling her hypertension, but that her blood sugar was fluctuating. Tr. at 477. She stated Plaintiff's depression had been very slow to improve. *Id.* Plaintiff followed up with Dr. Cifuentes the same day, and Dr. Cifuentes observed her to be anxious. Tr. at 498. Plaintiff endorsed decreases in sleep, appetite, motivation, and energy. *Id.* Dr. Cifuentes assessed a GAF score of 55 and increased Plaintiff's Prozac dosage to 20 milligrams. *Id.*

On January 4, 2010, Plaintiff indicated she had been approved for long-term disability benefits, but was disappointed because her job was no longer being held for her. Tr. at 524. Ms. Molinaroli noted Plaintiff had chewed off all her fingernails. *Id.* Plaintiff indicated she had recently walked her dog and attended a New Year's Eve

church service. *Id.* She stated she visited her hairdresser, but refused to wait inside the salon. *Id.* She complained of sleep disturbance and low energy. *Id.* Ms. Molinaroli indicated Plaintiff was motivated, focused on relevant topics, and participated actively in the session. Tr. at 524–25.

Ms. Molinaroli indicated Plaintiff was dressed up when she presented for therapy on January 11, 2010. Tr. at 522. Plaintiff indicated she had experienced a panic attack during a church program. *Id.* She stated she had not taken Klonopin before the program and was so overwhelmed by the crowd that she left without her purse or jacket. *Id.* Ms. Molinaroli encouraged Plaintiff to continue to go places and do things that involved interaction with others and to purchase clothes that fit properly. Tr. at 523.

On January 25, 2010, Plaintiff presented to Dr. Cifuentes with an anxious mood and restricted affect and indicated she was unable to tolerate the 20 milligram dose of Prozac. Tr. at 497. She reported decreased sleep, fluctuating appetite, and decreased energy. *Id.* Dr. Cifuentes assessed Plaintiff's response to interventions as fair-to-poor. *Id.* He stated Plaintiff's depressive symptoms were worse and her anxiety symptoms were stable. *Id.* He assessed a GAF score of 55. *Id.*

Plaintiff presented to Ms. Molinaroli on February 8, 2010, with sadness over her aunt's cancer diagnosis and impending death. Tr. at 519. Ms. Molinaroli indicated Plaintiff's motivation was excellent and that she was able to focus and identify and express her feelings. *Id.*

Plaintiff followed up with Dr. Cifuentes on February 22, 2010, and reported that she was doing okay until her aunt passed away. Tr. at 496. Dr. Cifuentes indicated

Plaintiff was anxious and tearful and endorsed decreased interest, motivation, and energy. *Id.* He assessed Plaintiff's response to interventions as fair and instructed her to continue her current medications. *Id.* He assessed a GAF score of 58. *Id.* Plaintiff visited Ms. Molinaroli the same day and reported difficulty dealing with her aunt's death. Tr. at 518. She stated she was close to her aunt, but had a hard time going to the hospital to visit her. *Id.* Ms. Molinaroli encouraged Plaintiff to go out and purchase an outfit that fit her as a way to boost her self-esteem. *Id.* She described Plaintiff as having excellent motivation, being active and verbal in sessions, and being able to accurately identify and express her feelings, but noted she had difficulty focusing on one topic. *Id.*

On March 15, 2010, Ms. Molinaroli observed that Plaintiff's clothing looked nice and that she had recently visited the manicurist. Tr. at 516. Plaintiff indicated she was not shopping or going out often, but stated she went to the grocery store with her mother, to a program at church, and to her son's basketball game. *Id.* She reported some improvement on Prozac, but indicated she was still having difficulty sleeping. *Id.* Ms. Molinaroli instructed Plaintiff to continue with her attempts to leave the house and to function in the community. Tr. at 517.

State agency consultant Michael Neboschick, Ph. D. ("Dr. Neboschick"), reviewed the record and completed a psychiatric review technique form ("PRTF") on April 5, 2010. Tr. at 526–39. He considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and assessed Plaintiff to have moderate restriction of activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr.

Neboschick also completed a mental residual functional capacity ("RFC") assessment and found Plaintiff to have moderate limitations in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially-appropriate behavior; and to adhere to basic standards of neatness and cleanliness. Tr. at 540–42. He further stated the following:

> Due to the symptoms from her mental impairments addressed in the SSA 2506, the claimant would be expected to have difficulty understanding, remembering and carrying out detailed instructions. She is capable of performing simple tasks for at least two hour periods of time. She would be expected to occasionally miss a day of work secondary to her symptoms. She is expected to have difficulty working in close proximity or coordination with co-workers. She would be best suited for a job which does not require continuous interaction with the general public.
>
> She is capable of single, repetitive tasks without special supervision. She can attend work regularly and accept supervisory feedback.

Tr. at 542.

On April 12, 2010, Plaintiff informed Ms. Molinaroli that she continued to have erratic sleep patterns and to neglect daily bathing and grooming. Tr. at 566. Ms. Molinaroli observed that Plaintiff worried excessively and had become fearful. *Id.* Plaintiff reported she had attended a formal ball with her sister and had kept her nail

appointments. *Id.* However, she also indicated she often stayed in her home for one to two weeks at a time. *Id.* Ms. Molinaroli indicated Plaintiff had good motivation and was active, verbal, and able to accurately identify and express her feelings, but she noted Plaintiff had difficulty focusing on one topic, leaving her home, being around others, concentrating, and remembering. *Id.*

Plaintiff reported improved mood to Dr. Cifuentes on April 19, 2010. Tr. at 564. Dr. Cifuentes indicated Plaintiff was showing a fair response to interventions and that her depression and anxiety were stable. *Id.* He assessed a GAF score of 60. *Id.*

Ms. Molinaroli indicated Plaintiff was well-dressed and groomed on May 3, 2010. Tr. at 568. Plaintiff informed Ms. Molinaroli that she recently attended a concert with her family members, but did not enjoy it because she started to sweat and panic. *Id.* She indicated her moods fluctuated and that she had problems with her memory. *Id.* Ms. Molinaroli stated Plaintiff participated well in the session, but noted she had difficulty focusing on one topic and seeing alternative perspectives. Tr. at 569. The next day, Plaintiff presented for a follow up appointment with Dr. Antia-Obong. Tr. at 545. Dr. Antia-Obong observed Plaintiff to have a flat affect and to be stressed and anxious. *Id.*

Plaintiff presented to Harriet R. Steinert, M.D. ("Dr. Steinert"), for a comprehensive medical exam on May 6, 2010. Tr. at 548–49. Dr. Steinert observed Plaintiff to be very pleasant and cooperative, but to have a flat affect. Tr. at 548. She indicated Plaintiff was able to get on and off the exam table without difficulty. *Id.* Plaintiff demonstrated full range of motion ("ROM") of the cervical spine and was not tender to palpation of her neck. *Id.* She had full ROM of all extremities, except for her

13

left knee. Tr. at 549. Dr. Steinert observed mild crepitation in Plaintiff's bilateral knees. *Id.* She noted no tenderness to palpation of any joints, swelling, inflammation, deformity, sensory deficits, or motor deficits. *Id.* Plaintiff had normal and equal grip strength bilaterally. *Id.* She demonstrated normal and equal fine and gross motor skills in both hands. *Id.* Dr. Steinert noted that Plaintiff could retrieve small items from her purse. *Id.* Plaintiff had no pedal edema or tenderness to palpation of the spine or paraspinous muscles. *Id.* The straight-leg raising test was negative bilaterally. *Id.* Plaintiff was able to walk on her heels and toes and across the room with a normal gait and without an assistive device. *Id.* Dr. Steinert noted that Plaintiff had pain in her lumbar spine, left hip, and knee. *Id.* She diagnosed hypertension, diabetes, depression, anxiety, chronic lumbar spine pain of uncertain etiology, and possible arthritis of the left hip and knee. *Id.*

On May 26, 2010, an x-ray of Plaintiff's lumbar spine showed mild degenerative disc disease, mild grade I retrolisthesis of L5 on S1 from degenerative change, mild degenerative change of the sacroiliac joints, and mild osteoarthrosis of the bilateral hips. Tr. at 550. An x-ray of Plaintiff's bilateral knees indicated mild-to-moderate osteoarthrosis of both knees. Tr. at 551.

State agency medical consultant Mary Lang, M.D., completed a physical RFC assessment on May 26, 2010. Tr. at 552–59. She indicated Plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; could occasionally climb ramps and stairs, balance, stoop, kneel,

crouch, and crawl; could never climb ladders, ropes, or scaffolds; and should avoid even moderate exposure to hazards. *Id.*

On June 4, 2010, Plaintiff informed Ms. Molinaroli that she was able to attend a graduation ceremony, but had difficulty after the ceremony because of hot flashes. Tr. at 570. Ms. Molinaroli indicated Plaintiff had excellent motivation; was able to focus on the relevant topic; was able to see different perspectives; was able to accurately identify and express her feelings; and was active and verbal during the session. *Id.*

On June 28, 2010, Plaintiff reported to Ms. Molinaroli that she was having difficulty paying for her doctors' visits. Tr. at 571. Plaintiff complained of pain in her shoulder and reduced grip, swelling, and pain in her fingers. *Id.* She indicated she had attended a class reunion at church, but felt uncomfortable. *Id.* Ms. Molinaroli indicated Plaintiff continued to attempt to break through her social anxiety and agoraphobic features by trying small tasks. *Id.* She described Plaintiff as having excellent motivation; being able to focus on relevant topics; and being active and verbal in sessions. *Id.*

Plaintiff reported some improvement to Dr. Cifuentes on August 4, 2010. Tr. at 562. She stated she did not get out much, but indicated her sleep and appetite had improved. *Id.* Dr. Cifuentes assessed a GAF score of 60. *Id.*

On August 23, 2010, Plaintiff indicated she hated dealing with people and felt like they were staring at her. Tr. at 573. She stated financial problems and worry about money were adding to her stress. *Id.* Ms. Molinaroli indicated Plaintiff had excellent motivation, participated well in treatment, and was highly compliant. *Id.*

On September 10, 2013, Plaintiff reported to Ms. Molinaroli that she was experiencing significant pain in her lower back and that she was rarely walking her dog or leaving her house. Tr. at 575. Ms. Molinaroli indicated Plaintiff had excellent motivation and was able to focus on relevant topics and participate actively during the session. *Id.* She observed Plaintiff to demonstrate a limp as she exited the office. *Id.*

On September 27, 2010, Plaintiff expressed anxiety over her finances and attending an aunt's funeral. Tr. at 690. Ms. Molinaroli encouraged Plaintiff to attend the funeral. *Id.* She noted that Plaintiff had difficulty focusing on one topic, but remained motivated and active during the therapy session. *Id.*

State agency medical consultant Cleve Hutson, M.D., completed a physical RFC assessment on October 18, 2010, and indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. Tr. at 576–83.

Plaintiff attended a mental status examination with John V. Custer, M.D. ("Dr. Custer"), on October 25, 2010. Tr. at 620–23. She reported an onset of depression following a hysterectomy in May 2009. Tr. at 620. She indicated she experienced anxiety attacks in enclosed spaces, but stated her counselor had encouraged her to get out more often. *Id.* Plaintiff endorsed fear that someone would hurt her. *Id.* She indicated she spent most of her time sleeping. Tr. at 621. She endorsed decreased appetite and ability to concentrate. *Id.* Dr. Custer observed Plaintiff to be well-dressed and groomed; to be a

little jittery at times; to answer questions in a logical and goal-directed manner; to have a somewhat distressed affect; to demonstrate no significant lapses in attention or concentration; to be alert and fully-oriented; to demonstrate memory of three items immediately and after a delay; to follow a three-step command; and to score 30 of 30 points on the Folstein Mini-Mental State Exam ("MMSE"). Tr. at 622. He diagnosed anxiety disorder, NOS and possible histrionic personality traits. *Id.* He indicated Plaintiff appeared "to be having some type of unusual anxiety reaction," and that it was "possible that personality traits and/or secondary gain features are influencing her presentation." *Id.* He stated he did not understand why Plaintiff had not received more aggressive treatment and stated he expected her symptoms to improve with continued treatment. *Id.* Dr. Custer noted that Plaintiff demonstrated no concentration problems during the exam and that he consider her to be capable of managing funds. Tr. at 622–23.

On October 28, 2010, Plaintiff indicated to Ms. Molinaroli that she had attended her niece's performance, but was unable to stay because she felt uncomfortable. Tr. at 688. Plaintiff indicated that her dress size had decreased from a size 20 to a size 12 because of her weight loss. *Id.* She stated that she felt uncomfortable because others were talking about her weight loss. *Id.* Ms. Molinaroli discussed with Plaintiff ways to handle others' comments. *Id.* Plaintiff indicated she felt like she had nothing to offer. *Id.* Ms. Molinaroli observed that Plaintiff had difficulty focusing on one topic and seeing alternative perspectives, but that she participated actively in the session. *Id.*

Plaintiff demonstrated mild anxiety during a visit with Dr. Cifuentes on November 10, 2010. Tr. at 588. She endorsed decreased sleep and energy, but stated she still felt that

she was getting better. *Id.* Dr. Cifuentes assessed Plaintiff's response to interventions as be fair and indicated a GAF score of 60. *Id.*

State agency consultant Kimberlie Brown, Ph. D. ("Dr. Brown"), completed a PRTF on November 16, 2010, and considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, and 12.08 for personality disorders. Tr. at 602–615. She indicated Plaintiff had moderate restriction of ADLs, moderate difficulties maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 612. Dr. Brown also completed a mental RFC assessment and found Plaintiff to be moderately limited in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 616–18.

On November 17, 2010, Plaintiff indicated that she had been unable to see Dr. Cifuentes until very recently, because she had to pay $200 toward an unpaid balance. Tr. at 687. Ms. Molinaroli observed Plaintiff to have recently pulled off her fingernails. *Id.* Plaintiff complained of disturbed sleep and indicated she had recently left her home only for medical visits. *Id.* Ms. Molinaroli described Plaintiff as having excellent motivation and being expressive, active, and verbal during the session, but noted she had difficulty focusing on one topic and seeing alternative perspectives. *Id.*

On November 29, 2010, Ms. Molinaroli indicated Plaintiff expressed frustration with her health. Tr. at 685. She described Plaintiff as being focused and participating actively in the session. *Id.*

On December 1, 2010, Plaintiff indicated to Dr. Antia-Obong that she had failed to follow up because of a lapse in insurance and was out of medications. Tr. at 653. She complained of paresthesias in her hands and feet. *Id.* Dr. Antia-Obong diagnosed diabetic neuropathy. Tr. at 654. She noted very little improvement in Plaintiff's depression and indicated her noncompliance was secondary to her depression. Tr. at 653–54.

On December 20, 2010, Dr. Antia-Obong noted some improvement in Plaintiff's depression. Tr. at 651. Plaintiff reported fluctuations in her blood sugar and paresthesias in her bilateral hands and feet. *Id.* She indicated Plaintiff's diabetes was not at its goal and that she was noncompliant with therapy. Tr. at 652. She recommended Plaintiff obtain nerve conduction studies and suggested she would prescribe insulin if Plaintiff's hemoglobin A1C had not decreased to its goal at a three-month follow up visit. *Id.*

Plaintiff presented to Dr. Antia-Obong on January 6, 2011, following an automobile accident. Tr. at 649. She complained of pain in her bilateral arms, right hip, and right middle finger. *Id.* Dr. Antia-Obong observed Plaintiff's right middle finger to be swollen at the metacarpal interphalangeal joint ("MIP") and noted tenderness over her right hip joint. *Id.* She referred Plaintiff for x-rays and physical therapy. Tr. at 650.

During a therapy session on January 21, 2011, Plaintiff explained to Ms. Molinaroli that she had hit a tree when she attempted to avoid a deer in the road and subsequently damaged her rental car by hitting a large raccoon. Tr. at 681. She indicated

19

she continued to have difficulty normalizing her sleep schedule. *Id.* She stated she was so tired that she could not function. *Id.* She expressed anxiety over money, her health conditions, her sleepiness, and issues with disability benefits. *Id.* Ms. Molinaroli indicated Plaintiff showed excellent motivation and was active and constructive during the session, but had difficulty focusing and seeing alternative perspectives. *Id.*

On February 4, 2011, Ms. Molinaroli indicated Plaintiff was frustrated with her health condition and financial problems and feared she would be unable to provide for her children. Tr. at 680. Plaintiff also endorsed fear of leaving her home and socializing. *Id.* Despite Plaintiff's fears and frustrations, Ms. Molanaroli indicated she was able to focus, see different perspectives, and actively participate during the session. *Id.*

Plaintiff presented to Gerald J. Shealy, M.D. ("Dr. Shealy"), at the Medical University of South Carolina ("MUSC") for an initial orthopedic consultation on March 1, 2011. Tr. at 746. Dr. Shealy noted that electrodiagnostic studies showed Plaintiff to have moderately severe median neuropathy in her right hand and middle trigger finger. *Id.* He observed Plaintiff to have slight thenar atrophy and decreased sensitivity in the median nerve distribution. *Id.* Phlen's, Tinel's, and Allen tests were all negative. *Id.* Plaintiff demonstrated normal ROM of her wrist and fingers. *Id.* Dr. Shealy noted a palpable nodule of the flexor profundus tendon and slight triggering in flexion and extension. *Id.* Dr. Shealy's diagnostic impressions were right carpal tunnel syndrome ("CTS") and right middle trigger finger. *Id.* He recommended Plaintiff undergo surgical decompression of the medial nerve in the carpal tunnel, but Plaintiff declined surgical

intervention. *Id.* Dr. Shealy instructed Plaintiff to use a splint and anti-inflammatory medications and to follow up as needed. *Id.*

Plaintiff visited Shane Woolf, M.D. ("Dr. Woolf"), at MUSC's orthopedic clinic on March 24, 2011, for bilateral shoulder pain. Tr. at 747. Dr. Woolf observed tenderness in Plaintiff's neck and acromioclavicular ("AC") joint and stiffness with ROM of Plaintiff's neck. *Id.* Dr. Woolf indicated x-rays showed moderate AC joint arthrosis in the right shoulder. *Id.* He diagnosed right shoulder AC joint arthritis and bilateral CTS. Tr. at 748. He recommended an injection, but Plaintiff declined. *Id.* He suggested Plaintiff return to physical therapy and take a third dose of Naprosyn daily. *Id.*

On April 4, 2011, Ms. Molinaroli stated Plaintiff had poor short-term memory and had forgotten her last appointment. Tr. at 756. Plaintiff indicated she continued to avoid others. *Id.* She noted that Dr. Cifuentes wanted to increase her antidepressant, but that she was resistant to the change. *Id.*

On April 18, 2011, Ms. Molinaroli indicated Plaintiff's panic attacks had increased and that she feared crowds and refused to answer the telephone. Tr. at 754. She noted Plaintiff would be willing to consider a change to her medications. Tr. at 754–55.

During a visit on April 19, 2011, Plaintiff informed Dr. Cifuentes that she was afraid of leaving her home. Tr. at 767. Dr. Cifuentes indicated Plaintiff's symptoms were more prevalent and described her as depressed; having a restricted affect; being anxious and worried; showing decreased interest and motivation; and being withdrawn. *Id.* He noted Plaintiff's response to interventions was poor and increased her dosage of Prozac from 10 to 20 milligrams. *Id.* He assessed Plaintiff to have a GAF score of 55. *Id.*

On May 2, 2011, Ms. Molinaroli indicated Plaintiff's depression had worsened. Tr. at 753. She indicated Plaintiff was not bathing, had poor short-term memory and concentration, and had no energy or motivation. *Id.* She noted that Plaintiff had neglected to pay her bills. *Id.* Ms. Molinaroli observed Plaintiff to demonstrate difficulty seeing alternative perspectives and focusing on one topic, but noted she participated actively in the session. *Id.*

On May 17, 2011, Plaintiff indicated she was still not eating adequately and complained of possible side effects from Prozac. Tr. at 766. Dr. Cifuentes indicated Plaintiff was anxious, avoided crowds, had decreased motivation, and was withdrawn. *Id.*

On July 12, 2011, Plaintiff indicated to Dr. Cifuentes that she was having difficulty dealing with the loss of her dog. Tr. at 769. Dr. Cifuentes noted Plaintiff's mood was depressed and anxious and her affect was restricted. *Id.* He described Plaintiff as having a slowed gait and station. *Id.* Despite his observations, Dr. Cifuentes indicated Plaintiff's depression and anxiety were improving and that she showed a fair response to interventions. *Id.*

Plaintiff also visited Ms. Molinaroli on July 12, 2011, and reported significant grief over the loss of her dog and a cousin. Tr. at 772. Ms. Molinaroli indicated Plaintiff's sadness and despair over the deaths had set her back and made her want to hide in her bedroom. *Id.* She suggested some options to give Plaintiff more structure in her life. *Id.*

Plaintiff followed up with Dr. Woolf on July 14, 2011. Tr. at 775. Dr. Woolf observed Plaintiff to have tenderness over her right AC joint and reduced active total elevation of her right shoulder. *Id.* He recommended Plaintiff consult with Dr. Shealy

again regarding her treatment options. *Id.* He gave Plaintiff another prescription for physical therapy and indicated he would consider a fluoroscope-guided injection in Plaintiff's right AC joint at the next visit. *Id.*

On July 26, 2011, Ms. Molinaroli indicated Plaintiff was continuing to grieve the loss of her dog. Tr. at 770. Plaintiff stated she wanted another dog, but lacked the motivation and energy to search for one. *Id.* Ms. Molinaroli observed that Plaintiff's affect was brighter and that she seemed more alert on the increased dosage of Prozac. *Id.*

On August 22, 2011, Plaintiff indicated to Ms. Molinaroli that she had a new dog and that her older daughter was moving to her neighborhood to assist her. Tr. at 784. She expressed frustration with her health and financial situation. Tr. at 785. Ms. Molinaroli observed Plaintiff to be well-oriented, but hypervigilant with a restricted affect and an anxious mood. *Id.* Plaintiff maintained good eye contact, but her recent memory was moderately impaired and her psychomotor activity showed slow reaction times. *Id.* Ms. Molinaroli indicated Plaintiff had a mild degree of conceptual disorganization. *Id.* She found Plaintiff to have an open and cooperative attitude, good insight, and fair judgment. Tr. at 786. She indicated Plaintiff was able to attend and maintain focus and was overly controlled and restrained. *Id.*

Plaintiff endorsed some improvement on the increased dosage of Prozac on October 4, 2011, but indicated she continued to feel down on some days and was not getting out a lot. Tr. at 781. She reported decreased interest and energy and impaired sleep. *Id.* Dr. Cifuentes described Plaintiff's depression and anxiety as being near her baseline and assessed a GAF score of 67. *Id.*

23

Dr. Cifuentes noted that Plaintiff was more depressed, tearful, and anxious during a visit on December 13, 2011. Tr. at 780. Plaintiff reported staying in her home and avoiding public places. *Id.* Her mood was depressed, anxious, and irritable and her affect was labile. *Id.* She endorsed symptoms that included increased sleep, anhedonia, tearfulness, withdrawal, distracted attention/concentration, and decreased appetite, interest level, motivation, and energy. *Id.* Dr. Cifuentes indicated Plaintiff's symptoms were more prominent and that her response to interventions was fair-to-poor. *Id.* He assessed a GAF score of 58. *Id.*

On February 7, 2012, Plaintiff indicated she was sleeping for only three or four hours during the night. Tr. at 779. Her mood was depressed and anxious and her affect was restricted. *Id.* Dr. Cifuentes observed Plaintiff to be distracted and to have fluctuating consciousness and mild impairment to recent memory. *Id.* Plaintiff reported an inability to be in crowds and stated she shopped for groceries at 3:00 a.m. *Id.* Dr. Cifuentes continued Plaintiff's prescription for Prozac and again prescribed Klonopin. *Id.* He assessed Plaintiff to have a GAF score of 58. *Id.*

Plaintiff was hospitalized at Bon Secours St. Francis Hospital for acute pancreatitis on September 9, 2012. Tr. at 831. Amanda Bright, M.D. ("Dr. Bright"), suspected a combination of Januvia, Hydrochlorothiazide ("HCTZ"), and Lisinopril caused Plaintiff to develop pancreatitis. *Id.* She discontinued Plaintiff's prescriptions and prescribed Norvasc, Metformin, and Glipizide. *Id.* Plaintiff's hemoglobin A1C was 13, and Dr. Bright had her confer with a diabetic educator. Tr. at 831–32.

Plaintiff followed up with Jennifer Goddard, M.D. ("Dr. Goddard"), in Dr. Antia-Obong's office on October 1, 2012. Tr. at 828. Plaintiff indicated her blood sugar was generally running in the low 200s and that she had significant neuropathy in her hands and feet. *Id.* She complained of arthritis-related pain in her knees, hips, and right shoulder. *Id.* She stated she had been unable to see her psychiatrist because of the cost and was having difficulty sleeping and leaving her home. *Id.* Nevertheless, she indicated she felt better than she had in the past. *Id.* Plaintiff's foot examination revealed significantly decreased sensation. *Id.* Dr. Goddard indicated Plaintiff would likely be unable to control her blood sugar without insulin and suggested she start insulin when she obtained insurance coverage. *Id.*

Plaintiff presented to Jenny Riley, M.D. ("Dr. Riley"), at MUSC's internal medicine clinic on January 5, 2013. Tr. at 810. She indicated she was out of medication and complained of pain in her right shoulder and bilateral knees. *Id.* Plaintiff's hemoglobin A1C was over 14 percent. Tr. at 811. Dr. Riley restarted Plaintiff on Metformin, prescribed Glipizide, and indicated Plaintiff may need to start insulin if her blood sugar did not improve. *Id.* She noted that Plaintiff's blood pressure was elevated and prescribed Lisinopril. *Id.* She also prescribed Ibuprofen for Plaintiff's knee pain and indicated she may refer her for physical therapy at her next visit. *Id.*

Plaintiff followed up with Joseph Blatt, M.D. ("Dr. Blatt"), at MUSC's internal medicine clinic on January 18, 2013. Tr. at 814. Dr. Blatt increased Plaintiff's dosages of Metformin and Glipizide. *Id.* He indicated Plaintiff would likely require insulin in the near future, but desired to attempt lifestyle modifications. Tr. at 816. He continued

Plaintiff's prescription for Lisinopril, but indicated he may need to prescribe Norvasc at a future visit if Plaintiff's blood pressure did not improve. *Id.*

Plaintiff presented to Dr. Blatt with occipital headaches on January 30, 2013. Tr. at 819. She indicated the headaches lasted from five to 10 minutes at a time and occurred several times per day over the past two to three months. *Id.* She stated she had stopped seeing her psychiatrist and was experiencing uncontrolled anxiety. *Id.* She endorsed symptoms that included sleep disturbance, anhedonia, lack of libido, lack of energy, poor concentration, and agitation. *Id.* Dr. Blatt suggested Plaintiff may be experiencing stress headaches from her uncontrolled anxiety. *Id.* He noted that Plaintiff's blood sugar log showed her readings to be mainly in the 140s. *Id.* Dr. Blatt observed that Plaintiff's hips had normal passive ROM, but that her right knee showed some crepitus on passive ROM. Tr. at 821. He prescribed Prozac to treat anxiety and Avastatin for cholesterol and referred Plaintiff for x-rays of her bilateral hips and knees. Tr. at 822.

Plaintiff presented to Martha Haines at MUSC for diabetes education on February 20, 2013. Tr. at 848. She indicated she was eating three meals per day. Tr. at 849. She stated she walked for an hour per day and exercised with her nephew. *Id.* Plaintiff's glucometer readings showed improvement in accordance with her dietary changes. Tr. at 850. She endorsed some insomnia, but was reluctant to change from Prozac to a sedating medication. Tr. at 851.

On March 20, 2013, Plaintiff reported to Dr. Blatt that her mood was somewhat improved, but that she still experienced intermittent day-long anxiety and continued to avoid going out in public. Tr. at 856. Plaintiff endorsed pain in her right shoulder, hip,

and knee and stated the pain was interfering with her ability to exercise. *Id.* Dr. Blatt noted that Plaintiff had great success in improving her A1C with oral medications and lifestyle modification. *Id.* He increased Plaintiff's dosage of Prozac from 10 to 20 milligrams and decreased her dosage of Glipizide from 10 to five milligrams. Tr. at 859. He noted Plaintiff was hypertensive and indicated he may need to add another blood pressure medication at her next visit. *Id.* He added Tramadol for Plaintiff's pain, recommended she alternate Tylenol and Ibuprofen throughout the day, and indicated he would consider intraarticular injections and referral to an orthopedist. *Id.*

On April 9, 2013, Plaintiff reported intermittent anxiety, difficulty leaving her home, mood swings, and occasional feelings of sadness. Tr. at 861. She indicated she continued to enjoy exercise and walking. *Id.* She stated Tramadol improved her pain, but caused her to feel tired. *Id.* Dr. Riley increased Plaintiff's Prozac dosage to 30 milligrams and prescribed HCTZ for hypertension. Tr. at 863–64. She decreased Plaintiff's Avastatin dosage from 40 to 20 milligrams daily. Tr. at 864. She indicated she would consider referring Plaintiff for intraarticular steroid injections for osteoarthritis once her glucose was under better control. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    August 26, 2011

Plaintiff testified she lived with an adult daughter, a 17-year-old son, an 11-year-old son, and an eight-year-old daughter. Tr. at 54. She indicated she weighed 190 pounds and had lost approximately 50 pounds over the last couple of years. Tr. at 55.

Plaintiff testified she worked as a sales representative for AT&T for 11 years. Tr. at 55–56. She indicated she last worked in May 2009, but subsequently received a sales commission and short-term disability payments. Tr. at 56.

Plaintiff testified that she had difficulty functioning after undergoing a hysterectomy. Tr. at 57. She stated she had panic attacks and difficulty thinking, became nervous and confused, and found it difficult to be around other people. *Id.* Plaintiff indicated she frequently experienced panic attacks while at church and in other public settings. Tr. at 58–59. She stated she left her home three to five times per month, but did not go out more often because of her panic attacks. Tr. at 59, 61. She indicated she no longer maintained her grooming because she only wanted to stay home and sleep. Tr. at 60. She stated she typically bathed twice a week. Id. The indicated she had very little patience with others and often yelled at her children. Tr. at 67.

Plaintiff testified she received treatment from Ms. Molinaroli, who was her therapist, and Dr. Cifuentes, who was her psychiatrist. Tr. at 58. She indicated she saw Ms. Molinaroli twice a month. Tr. at 59. She stated her Prozac dosage was recently

increased from 10 to 20 milligrams because she was so depressed and anxious that she did not want to leave her home. Tr. at 58.

Plaintiff testified she experienced pain and swelling in her hand. Tr. at 62. She stated her hand pain caused difficulty driving, cooking, and holding a pen. *Id.* She indicated she dropped items if she tried to hold them for too long. Tr. at 62–63. She testified she had difficulty twisting and making a fist with her right hand because of a middle finger trigger deformity. Tr. at 63. She indicated that she experienced numbness in her right hand. *Id.* She testified that Dr. Shealy had recommended surgery on her right hand, but that she had been reluctant to pursue it because he could not guarantee that it would improve her symptoms. Tr. at 71–72. She stated she had used her left hand more often because of the problems with her right hand and had developed pain and trigger finger deformities in her left hand, as well. Tr. at 64. She also endorsed pain in her right shoulder and left knee and leg. *Id.* She indicated she had diabetes that was treated with two types of medication. Tr. at 65. She stated she experienced four or five hot flashes per day that lasted for 10 to 15 minutes at a time. Tr. at 66.

Plaintiff testified she had a driver's license and was able to drive, but did not drive for more than 25 to 30 minutes at a time because of road rage and hand pain from gripping the steering wheel. Tr. at 61. She indicated she visited the grocery store once a month and went around 3:00 or 4:00 in the morning when there were few people in the store. Tr. at 61–62. She stated she had difficulty sleeping during the night and slept during the day. Tr. at 62. She testified that it took her a long time to perform household chores because she often became tired and frustrated and stopped the tasks. Tr. at 68. She

indicated her children had assumed responsibility for most of the household chores. *Id.* She stated she spent most of her time watching television and was no longer able to concentrate or hold a pencil to do crossword puzzles. Tr. at 69.

### ii.     November 21, 2013

Plaintiff testified that she stopped working after undergoing a hysterectomy in 2009. Tr. at 37. She stated she experienced joint pain and depression after the surgery. *Id.* She indicated she experienced pain in her hip, bilateral knees, and lumbar spine. Tr. at 38. She endorsed symptoms of anxiety, including difficulty sleeping and being around a lot of people. Tr. at 38–39. She indicated she had been diagnosed with diabetes. Tr. at 44.

Plaintiff testified that Dr. Riley treated her for arthritis. Tr. at 43. She indicated she was prescribed three arthritis medications. *Id.* She indicated she had received no relief from physical therapy in the past and was no longer participating in physical therapy. *Id.* She stated she also received treatment for anxiety through MUSC. Tr. at 44. She stated her blood sugar was recently elevated, but her doctor had not yet prescribed insulin because of her fear of needles. Tr. at 45. Plaintiff testified she was 5'4" tall and weighed 194 pounds. Tr. at 45–46. She stated her doctor informed her that her diabetes would be better controlled if she lost weight. *Id.*

Plaintiff testified she experienced pain in her hip after sitting for 10 minutes and that she had to rotate to put pressure on the other hip to reduce pain. Tr. at 38. She indicated she felt knee pain after standing for 10 to 15 minutes. *Id.*

Plaintiff testified that she experienced side effects from medications that included dry mouth and daytime sleepiness. Tr. at 39. She indicated she took five or six naps throughout the day that lasted for an hour or two at a time. *Id.*

Plaintiff testified that she lived in a mobile home with her 20-year-old son and her 10-year-old daughter. Tr. at 40. She indicated her children performed the household chores. *Id.* She stated she had difficulty preparing meals because she had to frequently stop and sit down. *Id.* She indicated her older daughter shopped for her groceries. Tr. at 42. Plaintiff stated she drove approximately three times a month for five or ten minutes at a time because of difficulty sitting for long periods and getting out of the car. *Id.* She testified she no longer attended church services because of her anxiety. Tr. at 40. She indicated she spent most days watching television. Tr. at 43.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Tanetta Watson-Coleman reviewed the record and testified at the hearing on November 21, 2013. Tr. at 46–49. The VE categorized Plaintiff's PRW as a retail sales clerk, *Dictionary of Occupational Titles* ("*DOT*") number 279.357-054, as light with a specific vocational preparation ("SVP") of three and a collections agent, *DOT* number 241.357-054, as light with an SVP of four. Tr. at 47–48. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; could not climb ladders or ropes; was unable to work in close proximity to coworkers; and should not have significant public interaction. Tr. at 48. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ

31

asked if there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as a housekeeper, *DOT* number 323.687-014, with 15,580 positions in South Carolina and 877,980 positions in the national economy; an electrical assembler, *DOT* number 729.687-010, with 2,310 positions in South Carolina and 187,920 positions in the national economy; and a wire worker, *DOT* number 728.684-022, with 2,740 positions in South Carolina and 229,240 positions in the national economy. *Id.* The ALJ asked the VE to assume the same limitations in the first question, but to further assume the individual would require unscheduled work breaks that would last for an average of two hours each day. *Id.* He asked if the individual could perform any of the jobs identified in response to the first question. *Id.* The VE responded that the additional limitations would eliminate all jobs. Tr. at 49.

### 2.    The ALJ's Findings

In his decision dated January 16, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
2.    The claimant has not engaged in substantial gainful activity since May 20, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe combination of impairments: diabetes, anxiety, and obesity (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). She can occasionally climb ramps and/or stairs, stoop, kneel,

crouch, and crawl. She is unable to climb ladders, ropes, or scaffolds. The claimant is unable to work in close proximity to co-workers. Additionally, the work she can do cannot require significant public interaction.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on February 13, 1962 and was 47 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 20, 2009, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 13–26.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly evaluate the treating medical sources' opinions;

2)    the ALJ failed to consider all of Plaintiff's impairments in assessing her RFC;

3)    the ALJ did not consider the combined effects of Plaintiff's impairments; and

4)    the ALJ failed to adequately evaluate the "paragraph B" criteria under the Listings of mental impairments.

The Commissioner counters that substantial evidence supports the ALJ's findings

and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such

---

[2]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, App'x 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v.*

impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.     Analysis

          1.     Treating Medical Sources' Opinions

Plaintiff argues the ALJ did not adequately evaluate the opinions of her treating physicians and therapist. [ECF No. 15 at 17]. The Commissioner maintains the ALJ properly weighed the opinion evidence. [ECF No. 22 at 8].

Medical opinions are statements from acceptable medical sources "that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, quoting 20 C.F.R. § 404.1527(a). The Social Security Administration's ("SSA's") rulings and regulations classify the following as acceptable medical sources: licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a); SSR 06-03p. Medical and psychological providers who are not acceptable medical sources are considered "other sources" and include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R. § 404.1513(d).

The SSA's regulations require that ALJs carefully consider medical opinions. SSR 96-5p. ALJs must accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and

that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2. Should the ALJ determine that the treating physician's opinion is not entitled to controlling weight, the ALJ is required to evaluate it along with all the other medical opinions of record based on the factors in 20 C.F.R. § 404.1527(c). *Id.*; SSR 96-2p. The relevant factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

ALJs are also guided in weighing the relevant factors by the provisions of 20 C.F.R. § 404.1527(c). A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §

404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[4] Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5).

In addition to evidence from acceptable medical sources, ALJs should also consider evidence from other medical sources to show the severity of an individual's impairments and how the impairments affect the individual's ability to work. 20 C.F.R. § 404.1513(d). ALJs are not required to explicitly consider the criteria in 20 C.F.R. § 404.1527(c) in evaluating the opinions of other medical sources that do not qualify as acceptable medical sources under the regulations. SSR 06-03p. However, because these factors represent basic principles for the consideration of all opinion evidence, they should guide ALJs in considering the opinions of other sources. *Id.*

This court should not disturb the ALJ's weighing of the medical opinion evidence of record "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam). ALJs' decisions should demonstrate that they considered and applied all the factors in 20 C.F.R. § 404.1527(c) and accorded each

---

[4] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). "[C]ourts have consistently held that unexplained and rote observations that an opinion is simply inconsistent with treatment notes or the record, by itself, is not a sufficient basis to reduce the opinion's weight." *Lydia v. Astrue*, No. 2:11-1453-DCN-BHH 2012 WL 3304107, at *10 (D.S.C. July 25, 2012), *adopted by* 2012 WL 3308108 (D.S.C. Aug. 13, 2012), *citing Cagle v. Astrue*, 266 F. App'x 788 (10th Cir. 2008) ("stating 'the ALJ failed to explain or identify what the claimed inconsistencies were between opinion and the other substantial evidence in the record,' and concluded that the ALJ's reasoning was not 'sufficiently specific to enable this court to meaningfully review his findings'"); *Langley v. Barnhart*, 373 F.3d 1116, 1122 (10th Cir. 2004).

In view of this authority, the undersigned considers each of the disputed opinions.

### a.    Dr. Cifuentes's Opinion

On January 13, 2011, Dr. Cifuentes assessed Plaintiff's impairments based on Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 628–32. He indicated Plaintiff had a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; feelings of guilt or worthlessness; and difficulty concentrating or thinking. Tr. at 628. He stated Plaintiff had somatic symptoms and anxiety, but no panic. Tr. at 629. He assessed Plaintiff as having marked restriction of ADLs; moderate difficulties in maintaining social functioning; moderate deficiencies in concentration, persistence, or pace; and one or two episodes of decompensation that were of extended duration. Tr. at 630. Dr. Cifuentes also completed

a mental RFC assessment and indicated Plaintiff was markedly limited in her abilities to carry out detailed instructions; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. Tr. at 633–35. He found Plaintiff to be moderately limited in her abilities to understand and remember very short and simple instructions; to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. *Id.*

Plaintiff contends the ALJ neglected to consider the opinions and evaluations of Dr. Cifuentes based on the criteria in 20 C.F.R. § 404.1527(c). [ECF No. 15 at 20]. She argues that Dr. Cifuentes's opinion reflects a deterioration in her mental impairments that is consistent with the record. *Id.* She maintains the ALJ and the Commissioner failed to consider the totality of Dr. Cifuentes's opinion statements. [ECF No. 23 at 3–4].

The Commissioner argues that substantial evidence supports the ALJ's finding that Dr. Cifuentes's opinion was entitled to little weight. [ECF No. 22 at 9]. She maintains that Dr. Cifuentes's opinion was inconsistent with his treatment notes. *Id.*

The ALJ accorded little weight to Dr. Cifuentes's opinion because it was inconsistent with his treatment notes. Tr. at 23. He pointed out that Dr. Cifuentes assessed Plaintiff's GAF scores that ranged from 55 to 65 from August 2009 to November 2010 and that the GAF scores suggested mild-to-moderate symptoms.[5] *Id.*

Although the ALJ found that Dr. Cifuentes's opinion was inconsistent with his treatment notes, he did not cite specific inconsistencies, aside from a reference to GAF scores. A GAF score may reflect the severity of a claimant's functioning or his impairment in functioning at the time the GAF score is assessed, but it is not meaningful without additional context. *See Green v. Astrue*, No. 1:10-1840-SVH, 2011 WL 1770262, at *18 (D.S.C. May 9, 2011); *see also Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning"). In *Parker v. Colvin*, No. 0:13-153-DCN, 2014 WL 4793711, at *4 (D.S.C. Sept. 25, 2014), the court considered an ALJ's similar evaluation of a treating physician's opinion and found that a citation to GAF scores and a general statement that it was "unsupported by the doctor's own treatment note observations and inconsistent with additional evidence of record," were insufficient to support the ALJs decision to discount the opinion. Here, because the ALJ failed to cite

---

[5] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR*. A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *Id.*

specific evidence, aside from the GAF scores, to support his conclusion that Dr. Cifuentes's opinion was inconsistent with his treatment records, the undersigned is unable to determine whether he relied upon substantial evidence to support his opinion.

Furthermore, the ALJ's decision does not reflect consideration of the relevant factors in 20 C.F.R. § 404.1527(c). The ALJ's decision does not reflect any deference for Dr. Cifuentes's opinion as that of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2). The ALJ also failed to consider that Dr. Cifuentes's opinion was supported by the fact that he examined and treated Plaintiff on 21 occasions between July 2009 and February 2012. *See* Tr. at 496–508, 562, 564, 584, 588, 766–69, 778–81; *see also* 20 C.F.R. § 404.1527(c)(1), (2). The ALJ neglected to consider the consistency between Dr. Cifuentes's opinion and the other evidence of record, including records from Dr. Antia-Obong and Ms. Molinaroli that were arguably consistent with his opinion. *See* 20 C.F.R. § 404.1527(c)(4). Furthermore, the ALJ's evaluation includes no consideration of Dr. Cifuentes's specialization as a psychiatrist. *See* 20 C.F.R. § 404.1527(c)(5). Because the ALJ's decision to discount Dr. Cifuentes's opinion relies only on an unsupported statement that Dr. Cifuentes's opinion lacks support in his treatment notes and fails to reflect any consideration of the other relevant factors in 20 C.F.R. § 404.1527(c), the undersigned recommends the court find it unsupported by substantial evidence.

b.     Dr. Antia-Obong's Opinion

On January 3, 2011, Dr. Antia-Obong indicated Plaintiff's pain was severe enough to preclude even simple, unskilled work tasks. Tr. at 745. On February 28, 2011, Dr. Antia-Obong completed a questionnaire regarding the physical effects of Plaintiff's pain.

Tr. at 744. She indicated Plaintiff suffered from pain as a result of radiculopathy and a cervical strain she received in a car accident. *Id.* She indicated Plaintiff's pain was disabling to the extent that it would prevent her from working in a sedentary position. *Id.*

Plaintiff maintains the ALJ also cited insufficient evidence to support his decision to accord little weight to Dr. Antia-Obong's opinion. [ECF No. 15 at 21]. She contends Dr. Antia-Obong had a long and involved treatment history with Plaintiff. *Id.* at 22.

The Commissioner argues the ALJ properly gave little weight to Dr. Antia-Obong's opinion because the methods used to treat Plaintiff's pain did not suggest the pain was disabling. [ECF No. 22 at 9].

The ALJ gave little weight to Dr. Antia-Obong's opinion because it was not supported by the medical evidence of record. Tr. at 21. He noted that Plaintiff was prescribed Ibuprofen for pain; had not been referred to a pain management specialist; declined injections for her shoulder pain; deferred surgery for her CTS; and failed to attend physical therapy. *Id.*

The ALJ's explanation of his decision to accord little weight to Dr. Antia-Obong's opinion does not reflect adequate consideration of the relevant factors under 20 C.F.R. § 404.1527(c). The ALJ's analysis reflects no consideration of Dr. Antia-Obong's status as a treating and examining physician or of the treatment relationship. *See* 20 C.F.R. § 404.1527(c)(1), (2). The ALJ did not consider Dr. Antia-Obong's opinion in light of her observations that Plaintiff had swelling in her MIP joint and tenderness over her right hip joint following the car accident in January 2011. Tr. at 649–50; *see also* 20 C.F.R. § 404.1527(c). While the ALJ pointed to specific actions that Dr. Antia-Obong did not take

44

to support his finding that her opinion was inconsistent with the other evidence of record, he failed to consider that she referred Plaintiff for physical therapy and x-rays immediately following her car accident and subsequently for electrodiagnostic studies and consultations with Drs. Shealy and Woolf. *See* Tr. at 650, 746, 747; *see also* 20 C.F.R. § 404.1572(c)(3). Finally, the ALJ did not consider the consistency of Dr. Antia-Obong's opinion with evidence that showed Plaintiff to have impairments that were likely to cause the pain she alleged. *See* Tr. at 746 (electrodiagnostic studies showed Plaintiff to have moderately severe median neuropathy in her right hand and middle trigger finger and Dr. Shealy recommended surgery), 747 (Dr. Woolf diagnosed moderate right shoulder AC joint arthritis and bilateral CTS). Because the ALJ's decision does not reflect contemplation of the relevant factors under 20 C.F.R. § 404.1527(c), the undersigned recommends the court find he did not adequately consider Dr. Antia-Obong's opinion.

c.    Ms. Molinaroli's Opinion

Ms. Molinaroli provided several opinion statements regarding Plaintiff's mental functioning on March 10, 2011. Tr. at 636–43. She considered Listing 12.04 and indicated Plaintiff had a disturbance of mood, accompanied by a full or partial depressive syndrome, as evidenced by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and initial thoughts of suicide. Tr. at 636. She considered the "paragraph C" criteria under Listing 12.04 and found that Plaintiff had repeated episodes of

decompensation, each of extended duration; a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate; and a current history of one or more years' inability to function outside a highly-supportive living arrangement, with an indication of continued need for such an arrangement. Tr. at 639. Ms. Molinaroli considered Listing 12.06 and indicated Plaintiff had anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms that was evidenced by generalized persistent anxiety accompanied by motor tension, apprehensive expectation, and vigilance; a persistent, irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. Tr. at 637. She specified Plaintiff had a fears of crowds, people staring at her, others' comments losing control in public, panic attacks in public, and not being able to get out of buildings. *Id.* She considered the "paragraph C" criteria under Listing 12.06, and indicated Plaintiff's symptoms resulted in a complete inability to function independently outside her home. Tr. at 640. She offered the following explanation:

> Client dreads crowds, going places/to events, church, etc. Clt has had relatives buy supplies for kids for school, and will not go to things/events she used to enjoy. She will not go anywhere where there could be a crowd. Often, she only leaves home to see doctor or me. She missed her children's sports events, funerals, family functions, graduations, etc.

*Id.* She rated Plaintiff as having extreme restriction of ADLs; extreme difficulties in maintaining social functioning, and extreme deficiencies in concentration, persistence, or pace. Tr. at 638. She indicated Plaintiff had experienced three episodes of decompensation that were of extended duration. *Id.* Ms. Molinaroli provided the following comments:

> Client will not get out of bed/shower/ADLs for days at a time. No interest in any activities she used to find interesting, marked sleep disturbance, wt loss of 50 lbs+, cannot remember where she had placed things (lost meds, keys, etc.), what she has done, etc. Has to depend on family to get the children school supplies—will not go out to shop. Will improve, then relapse with any new stressor.

*Id.*

Ms. Molinaroli also indicated in a mental RFC assessment that Plaintiff had the following markedly limited abilities: to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially-appropriate behavior; to adhere to

basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. Tr. at 641–43.

Plaintiff argues the ALJ erred in giving "little weight" to Ms. Molinaroli's opinion. [ECF No. 15 at 21]. The Commissioner maintains the ALJ properly found that Ms. Molinaroli's opinion was inconsistent with her treatment notes. [ECF No. 22 at 9]. She also argues that Ms. Molinaroli's indication that Plaintiff's condition was amenable to treatment suggests that it was not disabling. *Id.* at 10.

The ALJ accorded little weight to Ms. Molinaroli's opinion. Tr. at 21. He stated Ms. Molinaroli had "made a judgment about the nature and severity of the claimant's impairments" and had "attempted to provide a medical opinion" that she was not qualified to provide as an "other source" under the regulations. *Id.* He further concluded Ms. Molinaroli's opinion was "not supported by the treatment records" and appeared "overstated when compared to the activities, in which the claimant participates (Exhibit 27F)." *Id.*

Although the ALJ correctly observed that Ms. Molinaroli was not qualified to provide a medical opinion because she was not an acceptable medical source under the regulations, it does not appear that he appropriately considered her opinion. Pursuant to SSR 06-03p, "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source,'" but "depending on the particular facts

48

in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source.'" Therefore, Ms. Molinaroli's opinion regarding the nature and severity of Plaintiff's impairments could not be disregarded simply because she was not an acceptable medical source under the regulations. *See* SSR 06-03p. While the ALJ was not required to evaluate Ms. Molinaroli's opinion with the same stringency as the opinions of the acceptable medical sources, his decision should have been guided by the factors in 20 C.F.R. § 404.1527(c) and should have explained the weight given to the opinion in a way that allowed for meaningful review. *See id.* The ALJ's opinion does not reflect consideration of the relevant factors or explain his conclusion that Dr. Molinaroli's opinion was not supported by the treatment records. While the ALJ cited Exhibit 27F to support his finding that Ms. Molinaroli's opinion was overstated when compared to Plaintiff's activities, the undersigned notes that Exhibit 27F contains 64 pages of treatment notes covering the period from July 24, 2009, to February 4, 2011, and that the ALJ failed to point to any single observation within those records that he considered to be inconsistent with Ms. Molinaroli's opinion. *See* Tr. at 680–743.

Although the Commissioner argues that Plaintiff's impairments were not disabling because Ms. Molinaroli suggested they were amenable to treatment, the undersigned notes that the ALJ did not cite this argument to support his decision to give little weight to Ms. Molinaroli's opinion. "[T]he principles of agency law limit this Court's ability to affirm based on *post hoc* rationalizations by the Commissioner's lawyers." *Robinson ex rel. M. R. v. Comm'r of Soc. Sec.*, No. 0:07-3521-GRA, 2009 WL 708267, at *12 (D.S.C.

2009). "[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ." *Id.*, citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Because the ALJ failed to cite specific evidence to support his decision, the undersigned recommends a finding that substantial evidence did not support his decision to give little weight to Ms. Molinaroli's opinion.

### 2.    Severe Impairments and RFC Assessment

Plaintiff argues the ALJ did not adequately assess her RFC because he neglected to consider the limitations imposed by two of her severe impairments. [ECF No. 15 at 24]. The Commissioner maintains the ALJ considered and included in the RFC assessment all the limitations that were supported by the evidence of record. [ECF No. 22 at 10].

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and

remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to classify an impairment as severe at step two, but considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by her impairments and determine her work-related abilities on a function-by-function basis. SSR 96-8p. "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the

record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."
*Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ determined that Plaintiff's severe impairments included diabetes, anxiety, and obesity. Tr. at 13. He found Plaintiff had the RFC to perform light work that involved no climbing of ladders, ropes, or scaffolds and no more than occasional climbing of ramps or stairs, stooping, kneeling, crouching, or crawling. Tr. at 17. He indicated Plaintiff was unable to work in close proximity to coworkers and could not perform work that required significant public interaction. *Id.*

a.    CTS

Plaintiff argues the ALJ erred in finding that CTS was not a severe impairment. [ECF No. 15 at 24–25]. She points out that her physicians considered her CTS to be severe enough to require surgery. *Id.* at 24. She maintains the record conflicts with the evidence the ALJ cited to support his conclusion that CTS was not a severe impairment. *Id.* at 25.

The Commissioner argues that the record does not support additional limitations as a result of CTS. [ECF No. 22 at 11].

The ALJ indicated that Plaintiff's CTS had "been controlled with medication and/or other conservative measures." Tr. at 14. He further stated the following:

> The claimant's right carpal tunnel syndrome, is a medically determinable impairment, but does not cause more than minimal limitation in the claimant's ability to perform basic work activities and is, therefore, non-severe. With respect to the claimant's upper extremities, the Listing 1.02 *(Major dysfunction of a joint(s) (due to any cause))*, requires an inability to perform fine or gross movements effectively. In this case, the claimant is able to get small items out of and into her purse, write, and dial a phone

> without difficulty. This listing is therefore, not met or equaled (Exhibit 6E,
> 13F).

*Id.* He noted that Dr. Shealy had assessed Plaintiff as having normal ROM of her wrist and fingers. Tr. at 19. He stated Plaintiff had declined Dr. Shealy's recommendation that she undergo surgery and that Dr. Shealy had advised her to use a splint and anti-inflammatory medications. *Id.*

The undersigned recommends the court find the ALJ erred in determining Plaintiff's CTS to be a non-severe impairment and in declining to impose restrictions related to CTS as part of the RFC assessment. Plaintiff complained of hand pain to several of her medical providers on multiple occasions. *See* Tr. at 649 (complained to Dr. Antia-Obong of pain in both arms and in right middle finger on January 6, 2011), 680 (informed Ms. Molinaroli that she was undergoing physical therapy for CTS and fingers would "pop and jump" when therapist touched knot in her hand), 681 (indicated to Ms. Molinaroli that CTS affected both hands and caused a shooting pain up to her shoulder), 746 (reported numbness and tingling in right hand to Dr. Shealy; stated she experienced pain at night and with vigorous or repetitive utilization), 747 (complained to Dr. Woolf of pain radiating toward her hands and numbness in her fingers), 756 (reported pain in shoulder, knees, back, and hands to Ms. Molinaroli), 775 (informed Dr. Woolf that she was "still having carpal tunnel symptoms" on July 14, 2011), 779 (indicated to Dr. Cifuentes that her hands hurt). Dr. Shealy noted that electrodiagnostic studies conducted in January 2011 showed Plaintiff to have moderately severe median neuropathy in her right hand and right middle trigger finger. Tr. at 746. Plaintiff followed up with Dr.

Woolf, who diagnosed bilateral CTS. Tr. at 747. Dr. Shealy recommended surgery, but Plaintiff was reluctant to undergo the surgery. *See* Tr. at 746 ("Due to the longevity and severity of her symptoms, it is felt that surgical decompression of the median nerve in the carpal tunnel is indicated. However, she does not desire to have any surgical procedure performed.").

Although the ALJ cited some evidence to support his finding that CTS was a non-severe impairment, most of the evidence he cited pertained to the period prior to Plaintiff's car accident in January 2011, which seemed to be an exacerbating factor. *See* Tr. at 14 (citing Exhibit 6E, a function report dated April 1, 2010, and 13F, the report from Dr. Steinert's consultative examination on May 6, 2010). While the ALJ also cited to Dr. Shealy's finding that Plaintiff had normal ROM of her hands and fingers, he neglected Dr. Shealy's other findings that suggested some level of impairment. *See* Tr. at 746 (slight thenar atrophy in right hand, decreased sensibility in the median nerve distribution, middle trigger finger, palpable nodule of the flexor profundus tendon, and slight triggering noted in flexion and extension; positive electrodiagnostic studies; recommendation that Plaintiff proceed with surgery). The ALJ also disregarded Plaintiff's allegations of pain and impairment because she refused to proceed with surgery, but failed to consider her reasons for declining surgery or her subsequent complaints of pain. *See* Tr. at 758 ("Her hand is swollen from carpal tunnel – does not really want surgery bc it does no[t] seem to help people."), 772 ("She is terrified of the carpal tunnel surgery. She would rather attempt physical therapy. The people who have

hadd [sic] the surgery have huge scars and it does not seem to have helped them. She remembers what the ovoectomy did to her.").

In light of the evidence of record, the undersigned recommends the court find the ALJ erred in classifying Plaintiff's CTS as a non-severe impairment and in failing to consider the limitations it imposed as part of the RFC assessment. *See* Tr. at 746 (indicating Plaintiff experienced increased pain with vigorous or repetitive utilization).

### b.    Depression

Plaintiff argues the ALJ failed to consider her depressive disorder in determining her RFC. [ECF No. 15 at 26–27]. She maintains that her treating physicians, the consultative examiners, and the state agency consultants all diagnosed depressive disorder. *Id.*

The Commissioner argues that Plaintiff's depression was stable at the time of the hearing and imposed only mild-to-moderate limitations between July 2009 and February 2012. [ECF No. 22 at 12].

Despite the fact that six medical sources diagnosed depression, the ALJ failed to consider depressive disorder among Plaintiff's impairments. *See* Tr. at 471 (Ms. Molinaroli diagnosed severe major depressive disorder), 479 (Dr. Antia-Obong indicated Plaintiff was depressed), 529 (Dr. Neboschick found depression to be among Plaintiff's impairments), 549 (Dr. Steinert indicated depression among Plaintiff's diagnoses), 587 (Dr. Cifuentes diagnosed depression, NOS), 605 (Dr. Brown noted depression to be among Plaintiff's impairments). In addition, the record reveals that Plaintiff received specific treatment for depression from Dr. Cifuentes and Ms. Molinaroli from July 2009

until February 2012. Tr. at 461–73, 494–508, 513–25, 560–65, 566–75, 680–743, 753–58, 765–67, 768–69, 770–73, 779–83, 784–808. The record contains significant evidence to suggest depression imposed more than a minimal effect on Plaintiff's ability to perform basic work activities. *See* SSR 96-3p; SSR 85-28; *see also* 20 C.F.R. § 404.1521(a). Therefore, the undersigned recommends the court find that substantial evidence did not support the ALJ's failure to include it among Plaintiff's severe impairments.

Although a failure to consider a severe impairment at step two may be harmless if the impairment is considered at later steps, it does not appear that the ALJ considered Plaintiff's depression in assessing her RFC. *See Washington*, 698 F. Supp. 2d at 580; *Singleton*, 2009 WL 1942191, at *3. Both Dr. Cifuentes and Ms. Molinaroli indicated Plaintiff's depression imposed additional limitations that were not included in the ALJ's RFC assessment. *See* Tr. at 628, 630, 633–35, 636, 638, 639, 641–43. Notably, Dr. Cifuentes indicated in a mental RFC assessment that Plaintiff had marked limitations in her abilities to carry out detailed instructions, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting. Tr. at 633–35. Ms. Molinaroli indicated Plaintiff had marked limitations with respect to the same abilities, in addition to several others. *See* Tr. at 641–43. The RFC assessed by the ALJ limited Plaintiff to jobs that did not require she work in close proximity to coworkers or that involved significant public interaction. Tr. at 17. However, the ALJ did not limit Plaintiff to tasks with limited

instructions, provide additional break periods, or restrict Plaintiff to a work environment that involved few changes. In light of Plaintiff's severe impairment of depressive disorder and the evidence of record, the undersigned recommends the court find the ALJ erred in failing to explain his reasons for not including such additional restrictions in the RFC assessment. See SSR 96-8p; *see also Mascio*, 780 F.3d at 636.

### 3.    Combined Effects of Impairments

Plaintiff argues the ALJ did not consider the combined effects of her impairments. [ECF No. 15 at 27–28]. The Commissioner maintains the ALJ considered Plaintiff's impairments in combination in assessing her RFC. [ECF No. 22 at 12–13].

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and her disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner must consider the combined effect of all of the individual's impairments "without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(b)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* This court subsequently specified that "the adequacy

requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)).

The ALJ stated Plaintiff's combination of impairments did not meet or medically-equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. Tr. at 15. He indicated he considered Plaintiff's obesity in combination with her other impairments, but found "that the claimant's obesity does not have a negative effect upon the claimant's ability to perform routine movement beyond the residual functional capacity stated below, or upon her ability to sustain function over an 8-hour day." *Id.* He further stated the following:

> Moreover, I have considered the cumulative effects of the claimant's alleged impairments, both severe and non-severe, on the claimant's ability to work. *See* 20 CFR 404.1526(b)(3). While the combination of the claimant's impairments imposes some limitations, there is no indication in the record that the claimant's ability to sustain consistent function has been complicated by the combination of these impairments. There is no evidence that the combination of the claimant's impairments imposes greater limitations than those established in the residual functional capacity stated below."

Tr. at 17.

Had the ALJ adequately considered all of Plaintiff's impairments, the undersigned may be inclined to take him at his word that he "considered the cumulative effects" of Plaintiff's impairments. *See id.* However, because the ALJ failed to identify CTS and depression as severe impairments or to include limitations related to them in the RFC assessment, the RFC fails to reflect a consideration of the individual and combined

effects of Plaintiff's impairments. Therefore, the undersigned recommends the court find the ALJ did not adequately consider Plaintiff's combination of impairments.

4.    "Paragraph B" Criteria

Plaintiff argues the ALJ did not adequately consider the "paragraph B" criteria under the Listings for mental impairments because he considered only the detrimental impact of her anxiety, but disregarded the effects of depression. [ECF No. 15 at 29]. She also maintains the ALJ did not adequately consider Dr. Cifuentes's evaluation of the "paragraph B" criteria. *Id.* at 29–30.

The Commissioner argues Plaintiff's argument is meritless because the ALJ properly considered her impairments in combination. [ECF No. 22 at 13].

If a claimant alleges disability resulting from a mental impairment, the Regulations require that a special technique be used to evaluate the severity of the mental impairment. 20 C.F.R. § 404.1520a. The ALJ should first evaluate the individual's symptoms to determine if she has a medically-determinable mental impairment and then rate the degree of functional limitation that results from the impairment. 20 C.F.R. § 404.1520a(b). The ALJ must consider four functional areas in assessing the individual's degree of functional limitation, which include ADLs; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

The ALJ indicated he considered the "paragraph B" criteria under Listing 12.06 and found that they were not satisfied. Tr. at 16. He assessed Plaintiff to have mild restriction in ADLs; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of

decompensation that were of extended duration. *Id.* He explained that he considered Plaintiff to have mild restriction of ADLs because she helped her son get ready for school; checked to see if her son completed his homework; cooked; cared for her seven- and nine-year-old children; performed household chores; washed laundry; shopped; drove; cared for her dog; managed her finances; administered her own medications; and measured her blood sugar. *Id.* He explained his conclusion that Plaintiff had moderate difficulties in social functioning by noting that Plaintiff lived with her five children and one grandchild; walked her dog for relaxation; spent time talking on the telephone regularly; watched television; visited with her sister; attended church monthly and doctors' visits weekly; and testified she stayed home and kept to herself. *Id.* He found Plaintiff had mild difficulties in concentration, persistence, and pace because Plaintiff remembered three of three items immediately and after a delay; spelled "world" forward and backwards; followed a three-step command; scored 30 of 30 points on the Folstein MMSE; checked her own blood sugar; and was determined to be capable of simple, repetitive tasks in an RFC assessment. *Id.* He determined Plaintiff had no episodes of decompensation because she had not been hospitalized or required extensive mental health care treatment. Tr. at 17. Finally, he concluded the "paragraph B" criteria were not satisfied because Plaintiff's mental impairment did not cause at least two "marked" limitations or one "marked" limitation and repeated episodes of decompensation. *Id.*

The "paragraph B" criteria are the same under both Listings 12.04 and 12.06. *Compare* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(B), *with* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.06(B). Therefore, it is likely the ALJ would have found the same degree

of functional limitation under Listing 12.04 that he found under Listing 12.06. If Plaintiff merely alleged the ALJ erred in failing to consider the "paragraph B" criteria under Listing 12.04, the undersigned may be inclined to find the error harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error"). However, Plaintiff further challenges the ALJ's findings regarding her degree of functional limitation and argues she was limited to a greater extent than the ALJ acknowledged. In light of the undersigned's recommendations that the court find the ALJ erred in considering Plaintiff's depressive disorder and the opinions of Dr. Cifuentes, Dr. Antia-Obong, and Ms. Molinaroli, Plaintiff's argument appears meritorious. Upon remand, the ALJ should reassess the "paragraph B" criteria under the Listings for mental impairments in light of all the evidence of record.

## III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

February 4, 2016                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).